United States District Court
Southern District of Texas
**ENTERED**
January 20, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| VINTON PUBLIC POWER AUTHORITY, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-20-3609 |
| | § | |
| SAM RAYBURN MUNICIPAL POWER | § | |
| AGENCY, ET AL., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Sam Rayburn Municipal Power Agency ("Sam Rayburn") is a municipal energy provider organized in 1979 for the purpose of supplying the wholesale electrical energy needs of the Texas cities of Jasper, Livingston, and Liberty. Section 163.102(b) of the Texas Utilities Code prohibits Sam Rayburn from "engag[ing] in the distribution and retail sale of electrical power and energy." Tex. Util. Code § 163.102(b). Sam Rayburn is authorized to engage in the wholesale transmission and sale of electrical power and energy. The parties agree that "retail" means the sale of electrical power for use, and "wholesale" means the sale of electrical power for resale. The parties also agree that the states control the regulation of retail sales of electrical power and the federal government controls the regulation of wholesale sales of electrical power.

Sam Rayburn participates in and profits from the "Cambridge Project," a series of interrelated agreements that govern the transmission, distribution, and sale of wholesale and retail electrical power between a number of entities—including the plaintiff and the defendants—in Texas and Louisiana. Vinton Public Power Authority ("Vinton Power"), the plaintiff and a participant in the Cambridge Project, purchases electrical power from Sam Rayburn and then sells

that power to three "Industrial Participants" in Louisiana—Sassol, Conoco, and Citgo—in a retail transaction. Vinton Power alleges that Sam Rayburn unlawfully engages in the distribution and retail sale of power by its participation in the Cambridge Project, because Sam Rayburn receives a percentage of some of the profits of Vinton Power's retail sale of electrical power. Vinton Power argues that Sam Rayburn's receipt of any retail sale proceeds violates the Texas Utilities Code's prohibition on "engag[ing] in the distribution and retail sale of electrical power and energy." Vinton Power seeks: a declaratory judgment that Sam Rayburn's receipt of retail proceeds is unlawful; an injunction to prohibit Sam Rayburn from receiving any proceeds of retail sales in the future; and an order requiring Sam Rayburn to disgorge the money that it has received from Vinton Power's sale of retail power since March 2018.

Sam Rayburn argues that it does not receive proceeds derived from Vinton Power's retail sale of electrical power. Sam Rayburn also argues that it does not "distribute" or "sell" retail power; instead, Sam Rayburn sells power for resale, which is a "wholesale" transaction that it is authorized to engage in. Sam Rayburn sells power to Vinton Power, and Vinton Power—not Sam Rayburn—sells that power to the end consumers. Sam Rayburn also brings counterclaims against Vinton Power, alleging that Vinton Power has engaged in fraud and seeking declaratory and injunctive relief. (Docket Entry No. 47, at 13–14).

The cities of Livingston, Liberty, and Jasper—the municipal members of Sam Rayburn—intervened in this lawsuit because "if [Vinton Power] is successful in its claims against [Sam Rayburn] there will be no more distributions from [Sam Rayburn] to the Cities," and because "[Vinton Power] seeks to require the Cities to pay [Vinton Power] funds that [Sam Rayburn] has distributed to the Cities since October 21, 2020." (Docket Entry No. 53, at 2).

2

Vinton Power moved for summary judgment on its claims against Sam Rayburn and on its claims against the intervening defendants—the cities of Liberty, Livingston, and Jasper. (Docket Entry Nos. 15, 44). Sam Rayburn moved to dismiss Vinton Power's claims under Rule 12(b)(6), and also for partial summary judgment.[1] (Docket Entry Nos. 45, 49). This court dismissed Sam Rayburn's motion to dismiss without prejudice, stating that it would consider the issues under the respective motions for summary judgment. (Docket Entry No. 85). The intervenors—the cities of Liberty, Livingston, and Jasper—have also moved for summary judgment. (Docket Entry No. 57).

There are four pending motions for summary judgment. The parties have not completed discovery, agreeing that this case should be resolved as a matter of law on the record before the court. That record consists of (1) the various contracts that together make up the Cambridge Project and (2) testimony given in a 2018 Texas state court trial of a lawsuit that Sam Rayburn filed against its former general counsel, Ralph Gillis, on allegations of fraud and self-dealing breach of fiduciary duties.

Based on the record, the contracts, the motions, responses, and replies, and the applicable case law, the court dismisses Vinton Power's claims against all defendants, with prejudice, because the undisputed record evidence shows that Sam Rayburn has not unlawfully "engaged in the in the distribution and retail sale of electrical power and energy." Vinton Power's motions for summary judgment, (Docket Entries Nos. 44, 58), are denied with prejudice. Sam Rayburn's motion for summary judgment, (Docket Entry No. 49), is granted in part and denied in part. The intervenors'

---

[1] Sam Rayburn's motion for partial summary judgment seeks complete dismissal of all of Vinton Power's claims with prejudice, and for judgment on its counterclaims for declaratory and injunctive relief, but not its fraud counterclaim. (Docket Entry No. 49).

motion for summary judgment, (Docket Entry No. 57), is granted.  Sam Rayburn's counterclaim of fraud against Vinton Power remains.  A scheduling order to resolve that claim—if Sam Rayburn wishes to proceed on it—will be entered separately.

The reasons are set out below.

## I.     Background

Understanding the issues requires discussing the history of the Sam Rayburn Municipal Power Agency, the various agreements entered into by Vinton Power, Sam Rayburn, and other relevant entities for the transmission, distribution, and sale of electrical power, and the prior lawsuits.[2]

### A.     The Origin of the Sam Rayburn Municipal Power Agency and Initial Power Supply Arrangements

The Texas cities of Jasper, Liberty, and Livingston, like many cities, are responsible for providing their residents with a stable and adequate supply of electrical power.  These three cities and the Town of Vinton, Louisiana, purchased their power needs wholesale from Gulf States Utilities.  (Docket Entry No. 15-6, at 12).  In the late 1970s, Gulf States Utilities informed the three cities and the Town of Vinton that Gulf States was no longer "in a position to guarantee [it] would have adequate capacity to sell electricity to these cities at wholesale," but that it was constructing an electrical generating plant called "Nelson 6."  (*Id.*).  Gulf States encouraged the cities to buy "what's known as a load ratio share" of the Nelson 6 plant, which the cities could then use to supply electrical power to their residents.  (*Id.*).

---

[2] The complex factual background is made all the more challenging by the alphabet soup of acronyms that the parties have used to describe the many entities involved.  This court has tried to avoid using these acronyms when possible.

The four cities—Jasper, Liberty, Livingston, and the Town of Vinton—wanted to collectively finance the purchase of a 20% interest in the Nelson 6 power plant. At the time, the Texas Legislature did not permit coordination in electrical power supply transactions between Texas and Louisiana cities. On March 9, 1979, Texas State Representative Jim Browder submitted House Bill 1907, which "propose[d] to allow the Cities of Jasper, Liberty, and Livingston to join with a city in Louisiana and a private utility in the construction and operation of electrical power generating facilities." (Docket Entry No. 15-4, at 8). The bill provided that:

> Any municipal power agency created by two or more public entities located within 100 miles of the Sabine River and south of the Sam Rayburn Reservoir may engage in the generation and transmission of electric power and energy within or outside the State of Texas and may engage in the sale, purchase, or exchange of electrical power and energy with entities within or outside the State of Texas; provided, that nothing in this section authorizes an agency to engage in the distribution and retail sale of electric power and energy.

(*Id.*, at 5). The bill became law.

In 1979, the three Texas cities formed the Sam Rayburn Municipal Power Agency, and the Town of Vinton formed the Vinton Public Power Authority. The two entities collectively financed the purchase of a "load ratio share" in the Nelson 6 power plant. Vinton Power eventually took full ownership of Sam Rayburn's share in Nelson 6 for tax reasons, but both Sam Rayburn and Vinton Power continued to receive power from the Nelson 6 plant and shared in the plant operating costs. (Docket Entry No. 15, at 16, 16 n.9).

The costs of operating the Nelson 6 plant became untenable for the cities making up Sam Rayburn and Vinton Power. The power plant generated more power than Sam Rayburn and Vinton Power needed for their respective cities. (Docket Entry No. 15-3, at 27 ("[I]t turns out that in buying that 20 percent interest, Sam Rayburn Agency had really bought more capacity for

generation than it really needed to meet the cities' needs.")).  "[T]he cities were stuck with very expensive power and no practical way to use or sell the excess power capacity."  (Docket Entry No. 15, at 16).  Sam Rayburn's then-general counsel, Ralph Gillis, came up with a solution.  He helped Sam Rayburn—with Vinton Power as the nominal seller—sell its 20 percent interest in Nelson 6 back to Gulf States Utilities, which had since been acquired by an entity named Entergy. (Docket Entry No. 15-3, at 28).

Having sold their power supply back to Entergy, Sam Rayburn and Vinton Power needed to find a new power supply for the cities.  Gillis helped Sam Rayburn contract with Entergy Wholesale Operations Marketing, an affiliate of Entergy, to meet those needs.  (*Id.*).  Under the "Requirements Power Supply Agreement," Sam Rayburn agreed to purchase power at wholesale from Entergy Wholesale Operations Marketing to meet the needs of its constituent cities.  Sam Rayburn also maintained the right to purchase up to 3% more power each year from Entergy Wholesale Operations Marketing than the cities then required, at the original contract price.  "This provided a 'safety net' to insure that the cities would have access to adequate power to account for future growth."  (Docket Entry No. 15, at 16).  If Sam Rayburn did not exercise its right to purchase up to 3% additional power in a given year, then its right to purchase additional power at the contract rate accumulated.  For example, if in the first year Sam Rayburn did not purchase any additional power, then the next year Sam Rayburn would have the right to purchase up to 6% more power at the original contract rate.  The parties call this "headroom"—the difference of what Entergy Wholesale Operations Market was required to supply under the Requirements Agreement and the lower amount that Sam Rayburn was actually taking.  (Docket Entry No. 15-1, at 67).

6

Over the years, the percentage of additional power that Sam Rayburn was allowed to purchase, its "headroom" rights, accumulated. This required Entergy Wholesale Operations Marketing to maintain the electrical power capacity necessary to supply Sam Rayburn with the added power should it exercise its "headroom" rights. Entergy Wholesale Operations Marketing, however, would not receive any payment for that power until Sam Rayburn actually exercised its right to purchase it. Sam Rayburn's growing "headroom" rights were a potential liability for Entergy Wholesale Operations Marketing.

### B. The Nisco Deal

When Entergy acquired Gulf States Utilities in the early 1990s, it inherited two contracts that Gulf States Utilities had entered into with two power plants in Louisiana called Nelson 1 and 2 (not to be confused with the Nelson 6 plant). "Entergy was contractually obligated to buy the power from those plants at wholesale," but due to "adverse regulatory treatment from Texas and from Louisiana," Entergy was losing about $15 million a year from these contractual obligations. (Docket Entry No. 15-1, at 16). Entergy approached Gillis, Sam Rayburn's then-general counsel, to try to figure out a solution for Entergy to avoid the $15 million loss.

The solution that Gillis fashioned to help Entergy is known as the Nisco Deal. This deal excluded Sam Rayburn.[3] Gillis approached the City of Jasper—a member of Sam Rayburn—and Vinton Power. Under the Nisco Deal, Entergy assigned the output from Nelson 1 and 2 to Vinton Power, and in exchange, Vinton Power became the retail provider of power to three of Entergy's

---

[3] Sam Rayburn later sued Gillis, asserting that Gillis failed to disclose the opportunity to participate in the Nisco Deal to Sam Rayburn, breaching his fiduciary duty to Sam Rayburn, and fraudulently concealing his breach of fiduciary duty. *Sam Rayburn Mun. Power Agency v. Gillis*, No. 09-16-00339-CV, 2018 WL 3580159 (Tex. App. July 26, 2018).

7

customers—Sassol, Conoco, and Citgo—the so-called "Industrial Participants." (Docket Entry No. 15-1, at 10–11).

The City of Jasper's role in the Nisco Deal is less clear. It appears that the City of Jasper either provided Vinton Power with additional power supply or that the power that Vinton Power received from Nelson 1 and 2 first traveled through the City of Jasper. (*Id.*, at 11 ("The output of Nelson 1 and 2, the power plant, is no longer going to Entergy. It is going to—eventually to VPPA. Maybe it might take a little trip through Jasper, but it's going to VPPA.")). The City of Jasper was "a much more passive or inactive participant," and the deal could really "work without [it]," but "[Gillis and Entergy] wanted some involvement from an entity in Texas" so that Texas regulators would approve the deal. (*Id.*, at 16–17). The Nisco Deal started in 2001 and was supposed to end in 2008, but it was renewed until 2011. (*Id.*, at 11, 29).

### C.    The Cambridge Project

In 2011, the Nisco Deal came to an end in favor of the Cambridge Project. (Docket Entry No. 15-1, at 29). The Cambridge Project, unlike the Nisco Deal, included Sam Rayburn by placing "Sam Rayburn Municipal Power Agency in the middle of the flows of power." (*Id.*, at 20). To participate in the Cambridge Project and bring an end to the Nisco Deal, Sam Rayburn agreed to pay $3 million each year, for the life of the Nisco Deal, as a "reassignment fee." (*Id.*, at 23). That annual $3 million is divided evenly between the City of Jasper, Vinton Power, and a company called Obain Associates, which—unknown to Sam Rayburn at the time—was owned by Ralph Gillis. (*Id.*; Docket Entry No. 21-8). That self-dealing and Gillis's earlier failure to inform Sam Rayburn about the Nisco Deal led to Sam Rayburn's lawsuit against Gillis. *See Sam Rayburn Mun. Power Agency v. Gillis*, No. 09-16-00339-CV, 2018 WL 3580159 (Tex. App. July 26, 2018).

The Cambridge Project involves numerous contracts governing the sale and distribution of wholesale and retail electrical power among numerous entities. No party has clearly explained the Cambridge Project. After reviewing the contracts and record, and conferring with the parties at the motion hearing, the court reached the following understanding of the Cambridge Project that it reviewed on the record with all counsel and changed as necessary in light of their helpful clarifications and corrections.

The overview is that Sam Rayburn contracts for the supply of power from various electrical power generators to meet the power demands of the cities of Livingston, Jasper, and Liberty, Vinton Power, and Entergy Texas, Inc. The cities of Livingston, Jasper, and Liberty purchase power from Sam Rayburn so that they can, in turn, sell that power to their residents. Vinton Power purchases power from Sam Rayburn so that it can sell that power to the Town of Vinton, which in turn, sells that power to its residents. Vinton Power also purchases power from Sam Rayburn so that it can sell power to the three Louisiana "Industrial Participants." Entergy Texas, Inc., also purchases power from Sam Rayburn that it distributes to other entities. Once all the power has been transmitted or distributed, then the entities that purchased power pay for that power. The contracts that make up the Cambridge Project set forth the manner and timing of payments for power. The following describes the flow of the contractual rights to purchase electrical power and of payments for that power.

Sam Rayburn purchases electrical power from several sources, two of which are important here. Sam Rayburn purchases the power output from Nelson 1 and 2, which was reassigned from Vinton Power to Sam Rayburn under the "Wholesale Purchase Assignment Agreement." (Docket Entry No. 15-1, at 20; Docket Entry No. 21-11). Sam Rayburn also purchases power from Entergy

Wholesale Operations Marketing under the Requirements Power Sales Agreement, which existed before the Cambridge Project.  However, as part of the Cambridge Project, Entergy Wholesale Operations Marketing and Sam Rayburn entered into a Supplemental Requirements Power Supply Agreement.  (Docket Entry No. 21-12).  Under the Supplemental Agreement, Sam Rayburn agreed to "purchase capacity and energy from [Entergy Wholesale Operations Marketing] to supply [to Vinton Power]," and Vinton Power would then use that power to "supply the retail loads of certain Industrial Participants."  (*Id.*, at 2).  The most important feature of the Supplemental Agreement was that Entergy Wholesale Operations Marketing would provide Sam Rayburn with power "at a favorable rate," and in exchange, Sam Rayburn would waive its "headroom" rights—its right to purchase 3% more power each year—that had accumulated under the original Requirements Power Sales Agreement.  Additionally, instead of retaining the right to purchase an additional 3% more power each year, the Supplemental Agreement lowered that amount to 2%.  (Docket Entry No. 21-20, at 6).

Once Sam Rayburn purchases the power output from Nelson 1 and 2 and Entergy Wholesale Operations Marketing, it then sells the rights to that power to several entities.  Sam Rayburn sells power to the cities of Livingston, Liberty, and Jasper.  (*Id.*, at 7).  Sam Rayburn also sells power to Entergy Texas, Inc.  (Docket Entry No. 21-5, at 3).  Finally, Sam Rayburn sells power to Vinton Power.  (Docket Entry No. 15-1, at 21).

Vinton Power, in turn, sells the power that it receives from Sam Rayburn to the same three Industrial Participants as under the Nisco Deal.  (Docket Entry No. at 15-1, at 21; Docket Entry No. 21-14).  Vinton Power also sells power to the Town of Vinton.  The Town of Vinton, and the

cities of Livingston, Liberty, and Jasper, sell the power that they have purchased from Sam Rayburn and Vinton Power to their residents for consumption.

In sum:

- Sam Rayburn contracts with Nelson 1 & 2 and Entergy Wholesale Operations Marketing for enough power supply to meet the demands of the cities of Livingston, Liberty, and Jasper; Vinton Public Power Authority; and Entergy Texas, Inc.  This is a wholesale transaction.

- Sam Rayburn sells that power supply to the cities of Livingston, Liberty, and Jasper; Vinton Public Power Authority; and Entergy Texas, Inc.  This is a wholesale transaction.

- The cities of Livingston, Liberty, and Jasper sell the power that it has contracted for from Sam Rayburn to its residents.  This is a retail transaction.

- Vinton Power sells the power that it has contracted for from Sam Rayburn to the Town of Vinton and to three Industrial Participants.  The sale of power to the three Industrial Participants is a retail transaction.  The sale of power to the Town of Vinton is a wholesale transaction.

- The Town of Vinton sells the power that it has contracted for from Vinton Power to its residents.  This is a retail transaction.

The following chart, which was prepared by the court and reviewed by the parties, also outlines the flow of the contractual rights to power:



After the power is transmitted and distributed, the various entities then pay for the power they receive. Every entity that receives power pays for that power, and every entity that transmits or distributes power is paid for the power, but in different ways and at different times. Most of the money that is paid under the Cambridge Project is paid into a trust, called the Jasper/VPPA Settlement Trust. The Jasper/VPPA Settlement Trust originated under the Nisco Deal.

The cities of Livingston, Liberty, and Jasper pay Sam Rayburn for the power that they receive, and in turn, Sam Rayburn pays Entergy Wholesale Operations Marketing, which supplies the power for the cities.  The Town of Vinton pays Vinton Power for the power it receives, and in turn, Vinton Power pays Entergy Wholesale Operations Marketing, which supplies the power for the Town of Vinton.[4]  (*See generally* Docket Entry No. 21-12).

Entergy Texas, Inc. pays Sam Rayburn for the power it receives by paying that money to the Trustee and Agent for the Jasper/VPPA Settlement Trust.  (Docket Entry No. 21-9, at 3; *see also* Docket Entry No. 21-12, at 2).  Vinton Power does not appear to pay Sam Rayburn for the power that Sam Rayburn contracts for on behalf of Vinton Power.  After Vinton Power sells power to the three Industrial Participants, the Industrial Participants do not directly pay Vinton Power for the power they receive.  Instead, the Industrial Participants pay Entergy Gulf States Louisiana.  Entergy Gulf States Louisiana is the entity that "provide[s] coordination services [to the industrial participants], including customer services, billing, payment and collection services."  (Docket Entry No. 21-6, at 2).  In other words, while Vinton Power supplies the Industrial Participants with power, the Industrial Participants interface with, receive invoices from, and pay, Entergy Gulf States Louisiana for that power.

Entergy Gulf States Louisiana takes the money that it receives from the Industrial Participants and distributes that money in accordance with a contract called the "Combined Coordination Agreement."  (Docket Entry No. 21-6).  First, Entergy Gulf States Louisiana pays

---

[4] This explanation of how the cities of Liberty, Livingston, and Jasper, and the Town of Vinton pay for power was not made clear from the documents in the record.  At the motion hearing on January 14, 2022, however, the parties agreed and explained—in response to a chart that this court prepared and asked the parties to discuss at the hearing (*see* Docket Entry No. 90)—that this was how Sam Rayburn, Vinton Power, and Entergy Wholesale Operations Marketing are reimbursed for the power that they contract for and supply to the cities.

any "applicable taxing authorities." Entergy Gulf States Louisiana pays "Nelson," the power plant that generates power for Sam Rayburn, "for all amounts, if any, then due and payable by [Sam Rayburn] to Nelson for energy purchased by [Sam Rayburn] from Nelson" that is ultimately distributed to the Industrial Participants. Entergy Gulf States Louisiana then takes a cut of the money for itself, for the coordination services that it renders. And finally, if any amount remains, Entergy Gulf States Louisiana pays that money into the Jasper/VPPA Settlement Trust. (*Id.*).

The Trustee and Agent for the Jasper/VPPA Settlement Trust, Kim Despeaux, then distributes money that the Trust has received to several entities. The Trustee first pays Entergy Wholesale Operations Marketing, on behalf of Sam Rayburn, for any remaining power that Sam Rayburn contracted for that was not already paid. (Docket Entry No. 15-1, at 93; Docket Entry No. 21-15). Then, from the "remaining funds" in the Trust, the Trustee pays Sam Rayburn 90.61% and Vinton Power 9.39%. (Docket Entry No. 21-7).

In sum, the Jasper/VPPA Settlement Trust receives payments for power from:

- Entergy Texas, Inc., as payment for the power that it purchased at wholesale from Sam Rayburn, and from Entergy Gulf States Louisiana for money left over from Vinton Power's retail sale of power to the Industrial Participants, after it has paid relevant taxing authorities, the Nelson power plant, and itself.

The Jasper/VPPA Settlement Trust then pays Entergy Wholesale Operations Marketing for the power that Sam Rayburn purchased wholesale and distributes any remaining funds to Sam Rayburn and Vinton Power, with Sam Rayburn receiving 90.61% of the remaining funds, and Vinton Power receiving 9.39%.

The following chart, which was prepared by the court and reviewed by the parties, outlines the flow of payments for power:

14



The Cambridge Project is set to continue until December 31, 2035.  (Docket Entry No. 21-

6, at 3).  The project has been extremely profitable for Sam Rayburn, its member cities, and for

Vinton Power.

**D.     Relevant Lawsuits**

Since the Cambridge Project began, two separate lawsuits have been filed—one in state

court by Sam Rayburn and one in federal court by the Trustee of the Jasper/VPPA Settlement

Trust.  Each of these lawsuits is relevant to the current dispute between Sam Rayburn and Vinton Power.

Several years after the Cambridge Project's inception, Sam Rayburn sued Ralph Gillis, its former general counsel, who had orchestrated the Cambridge Project.  *See Sam Rayburn Mun. Power Agency v. Gillis*, No. 9-16-339-CV, 2018 WL 3580159 (Tex. App. July 16, 2018).  Sam Rayburn alleged that Gillis breached his fiduciary duty to Sam Rayburn by "fail[ing] to disclose the opportunity to participate in the Nisco Deal" to Sam Rayburn.  *Id.* at *1.  Sam Rayburn also alleged that Gillis failed to disclose that "he would be personally receiving millions of dollars" from the Cambridge Project, by contracting for Obain Associates—his "alter ego"—to receive 1/3rd of the $3 million "reassignment fee" that Sam Rayburn pays annually to the Trust.  *Id.*  A jury found that Gillis had breached his fiduciary duty and committed fraud.  The jury verdict was upheld on appeal.[5]  Vinton Power relies on testimony given during the *Gillis* jury trial, and in particular, on testimony given by Gillis, to support its claims.

Second, and also relevant to this case, is an interpleader action filed in 2020 in the Southern District of Texas by the Trustee for the Jasper/VPPA Settlement Trust and the Trust itself against Sam Rayburn and Vinton Power.  The Trust and Trustee initiated the interpleader action after Vinton Power sent the Trustee a letter "withdraw[ing] authority of the [Trustee] to distribute the 'remaining funds' to [Sam Rayburn] or [Vinton Public Power Authority]" from the Trust because it "contest[ed] the ongoing 90.61%/9.30% split" of the "remaining funds."  (Case No. 4:20-cv-

---

[5] Gillis continues to receive $1 million every year out of the Cambridge Project despite the jury's verdict. (Docket Entry No. 21, at 15).

0255 (Docket Entry No. 1, at 4)).  The Trustee alleged that she did "not know what to do with these funds absent an agreement or resolution between [Vinton Power] and [Sam Rayburn]." (*Id.*).

The parties quickly and amicably resolved the lawsuit with no motions practice.  The parties agreed that the Trust and the Trustee "w[ould] continue to pay the 'remaining funds' under the Cambridge Project in the percentages of 90.61% to Sam Rayburn Municipal Power Agency and 9.39% to Vinton Public Power Authority." (Case No. 4:20-cv-0255 (Docket Entry No. 13, at 2)).  That arrangement has continued over the last two years.

### E.     The Procedural History of This Lawsuit

Five months after the Trustee's and Trust's interpleader action was dismissed based on the parties' agreement, Vinton Power filed this lawsuit.  (Docket Entry No. 1).  Vinton Power continues to contest, as it did in its letter to the Trustee of the Jasper/VPPA Settlement Trust, the "split" of the "remaining funds" between Sam Rayburn and Vinton Power.  Sam Rayburn moved to dismiss Vinton Power's complaint, (Docket Entry No. 6), and Vinton Power promptly moved for summary judgment, (Docket Entry No. 15).

Sam Rayburn argued that dismissal was required because: (1) Vinton Power failed to join necessary parties—the Trustee of the Jasper/VPPA Settlement Trust and the Texas cities of Jasper, Liberty, and Livingston; (2) Vinton Power failed to state a claim for relief; (3) its complaint was barred by res judicata because of the earlier interpleader action; and (4) the complaint was barred by accord and satisfaction because the parties had recently agreed to the distribution of the remaining funds in the Trustee's interpleader action.

17

The magistrate judge recommended that the motion to dismiss be granted in part and denied in part, and that the motion for summary judgment be dismissed without prejudice as premature. (Docket Entry No. 29, at 1).  The judge made the following determinations:

- The judge agreed that the Trust and Trustee were required parties, because "[t]he injunctive relief Plaintiff seeks would require the Trustee to stop distributing funds to SRMPA, contrary to the Agreed Dismissal Order and the terms of the Settlement Agency Contract," and that Vinton Power needed to amend its complaint to join them.  (*Id.*, at 4–5).

- The judge did not find that the cities of Liberty, Livingston, and Jasper were required parties, but stated that they should be offered the opportunity to intervene.

- The judge recommended that the motion to dismiss under Rule 12(b)(6) for failure to state claim be denied because "[a] ruling on the merits of Plaintiff's claims based on statutory and contract interpretation at the motion to dismiss stage [was] premature."  (*Id.*, at 8).

- The judge disagreed that dismissal was required on res judicata grounds, because "the Agreed Dismissal Order" in the interpleader action "effected a dismissal without prejudice and [did] not constitute a decision on the merits."  (*Id.*, at 9–10).

- And finally, the judge recommended that the court deny dismissal on accord and satisfaction grounds, because the accord and satisfaction defense requires "a new contract, either express or implied, in which the existing obligation is released by agreement of the parties," and "[t]he Agreed Dismissal Order did not change the terms of [any] contract nor did it resolve the dispute between the parties by creating a new contract."  (*Id.*, at 10 (quoting *Collins v. Moroch*, 339 S.W.3d 159, 164 (Tex. App. 2011))).

The district court adopted the magistrate judge's memorandum and recommendations. (Docket Entry No. 41).

Vinton Power amended its complaint, (Docket Entry No. 42), and, a little over a week later, moved to renew its summary judgment motion.  (Docket Entry No. 44).  Sam Rayburn moved to dismiss, (Docket Entry No. 45), filed counterclaims against Vinton Power and a crossclaim against the Jasper/VPPA Settlement Trust and its Trustee, (Docket Entry No. 47, 50), and moved for partial summary judgment, (Docket Entry No. 49).  Vinton Power also moved for summary judgment against the intervenors—the cities of Livingston, Liberty, and Jasper—and the

18

intervenors moved for summary judgment against Vinton Power.  (Docket Entry No.57, 58).
Motions to compel and strike responses were also filed.  (Docket Entry No. 47, 59).

The case was transferred to this court.  This court denied the motions to compel and strike
and denied Sam Rayburn's motion to dismiss "without prejudice to the court's evaluation of the
arguments in the summary judgment motions raising the same issues."  (Docket Entry No. 85, at
3).  This opinion addresses the remaining motions: Vinton Power's motions for summary judgment
against Sam Rayburn and the intervenors, (Docket Entries Nos. 44, 58), Sam Rayburn's motion
for partial summary judgment on Vinton Power's claims and on two of its counterclaims, (Docket
Entry No. 49), and the intervenors' motion for summary judgment against Vinton Power, (Docket
Entry No. 58).  For the reasons that follow, the court denies Vinton Power's motions for summary
judgment, grants the intervenors' motion for summary judgment, and grants in part and denies in
part Sam Rayburn's motion for partial summary judgment.

## II.    The Legal Standard for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"
*Shepherd ex rel. Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019)
(quoting Fed. R. Civ. P. 56(a)).  "A material fact is one that might affect the outcome of the suit
under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury
could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d
605, 610 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial
responsibility of informing the district court of the basis for its motion," and identifying the record

evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., LP*, 865 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, [the summary judgment motion] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

When the facts are undisputed, the court "need only decide whether those undisputed facts are material and entitle the movant to judgment as a matter of law." *Flowers v. Deutsche Bank Nat. Tr. Co.*, 614 F. App'x 214, 215 (5th Cir. 2015).

## III.   Analysis

Under the Concurrent Operations Protocol—an agreement entered into as part of the Cambridge Project—the Trustee of the Jasper/VPPA Trust is instructed to pay Sam Rayburn and Vinton Power the profits from the Cambridge Project that remain after other delineated expenses are paid.  The Concurrent Operations Protocol states that Sam Rayburn receives 90.61% of those "remaining funds" and Vinton Power receives 9.39%.

Vinton Power alleges that this "split" of the "remaining funds" is unlawful because Sam Rayburn is not authorized "to engage in the distribution and retail sale of electric power and energy" under Texas statute.  *See* Tex. Util. Code § 163.102(b).  Vinton Power does not dispute that Sam Rayburn's purchase of electrical power and resale of that power to the cities of Livingston, Liberty, and Jasper, to Entergy Texas, Inc., and to Vinton Power are wholesale transactions in which Sam Rayburn is statutorily allowed to engage.  (Docket Entry No. 42, at 6).  Vinton Power does not allege that Sam Rayburn is involved in the sale of power to the Industrial Participants, which is a retail transaction.  The contract that assigned Entergy Gulf States Louisiana's "right to serve" the Industrial Participants' power supply needs to Vinton Power does not once mention Sam Rayburn.  (*See* Docket Entry No. 21-14 ("Long-Term Agreement for the Assignment of Retail Load . . . entered into by and between Entergy Gulf States Louisiana, L.L.C. and Vinton Public Power Authority")).  Instead, Vinton Power alleges that Sam Rayburn has violated the Texas Utilities Code because it receives some of the proceeds from Vinton Power's

21

distribution and retail sale of power to the three Industrial Participants.  (Docket Entry No. 42, at 8).

Vinton Power alleges, however, that Sam Rayburn's receipt of retail funds did not violate the Texas Utilities Code at the beginning of the Cambridge Project.  Instead, Vinton Power argues that Sam Rayburn's receipt of proceeds that allegedly originated from Vinton Power's retail sale of power was lawful from 2011 to March 2018.  This is allegedly because Sam Rayburn, from 2011 to 2018, used the proceeds from the Cambridge Project as "reimbursement of the headroom" rights that it had accumulated under the Requirements Power Supply Agreement with Entergy Wholesale Operations Marketing.  (Docket Entry No. 42, at 15).

According to Vinton Power, "reimbursement of the headroom" is shorthand for the following steps.  Sam Rayburn purchased power from Entergy Wholesale Operations Marketing under the Requirements Power Supply Agreement.  Under this Agreement, Sam Rayburn had the right to buy 3% more power than its member cities' then-current needs, in case the cities grew and needed greater power supply in the future.  If Sam Rayburn Agency did not exercise its right to purchase 3% more power, then the right to purchase the additional power "rolled over" to the following year and compounded.  This is "headroom": "the excess of what the generator is obligated to provided versus what the customer is taking."  (Docket Entry No. 15-1, at 67).

This headroom was, according to Vinton Power, a huge liability for Entergy Wholesale Operations Marketing.  As the years passed, and Sam Rayburn did not exercise its right to purchase additional power because it did not have buyers needing it, Entergy Wholesale Operations Marketing had a growing obligation to sell more power at the 1998 Requirements Power Supply Agreement price.  Entergy Wholesale Operations Marketing had to maintain the capacity to

provide Sam Rayburn with more and more power, but it was not receiving payment for storing that power.  (*Id.*, at 68).

The solution was baked into the Cambridge Project.  Sam Rayburn agreed to waive "headroom" rights that it had accumulated under the Requirements Agreement and lowered its right to purchase 3% of additional power to 2% going forward in a new "supplemental" agreement. The parties disagree on why Sam Rayburn agreed to waive its "headroom" rights and how Sam Rayburn benefitted from waiving its rights.

Vinton Power argues that "[Sam Rayburn's] giving up its headroom to enter into the Cambridge Project provided a colorable justification for . . . receiving the proceeds of retail sales, despite the prohibition in Tex. Util. Code § 163.102(b)."  (Docket Entry No. 42, at 9).  According to Vinton Power, Sam Rayburn's accumulated "headroom" was equivalent to an asset that had a monetary value.  Rather than having Sam Rayburn use its "headroom" rights to purchase more power from Entergy Wholesales Operating Marketing, the Cambridge Project was structured to reimburse Sam Rayburn for the "headroom" rights that it owned but did not use.  Vinton Power argues that when Sam Rayburn was using the profits from Vinton Power's retail sales to reimburse its excess "headroom" rights, it was not violating the Texas Utilities Code.  But once it received enough money to "reimburse" itself for the monetary value of its accumulated "headroom" rights, then, according to Vinton Power, Sam Rayburn was no longer supposed to receive any profits from Vinton Power's retail sales of electric power, because then the receipt of retail funds would violate the Texas Utilities Code.

Vinton Power relies on one piece of "evidence" to support its understanding of the Cambridge Project: testimony from Ralph Gillis, the former general counsel of Sam Rayburn, from

23

the state court trial in which the jury found that he committed fraud and self-dealing in breach of

his fiduciary duties.  Gillis testified that:

> [T]hat 90.61 distribution that [Sam Rayburn is] getting, they have received the
> value, the net present value of that headroom, which was a critical element in terms
> of trying to comply with tax regulations and was approved by Fulbright & Jaworski
> as they reviewed the contracts. . . .   The problem I had in bringing Rayburn in [to
> the Cambridge Project] is that all the money that's running around in the Cambridge
> Project is generated by Vinton selling power at retail to the IP loads.  The statute
> under which Rayburn was formed specifically withholds authority for Rayburn to
> engage in retail sales or distribution.  That pool of revenue is the product of retail
> sales or distribution.  So, I had to find some way that I could get that money and
> get some part of it over to Rayburn.  The headroom, that 90.69 [sic] percent, that
> headroom value was a commercial transaction and was for wholesale power supply,
> not retail; but I could spend those retail funds to pay for that headroom.  However,
> I had to get through the whole process in order to get to a point where the funds
> could be expended that way. . . .   [T]hat retail money is used to pay for a wholesale
> transaction, which is the waiver of the headroom.

(Docket Entry No. 15-7, at 12–16).

> Gillis later testified that:

> The reason for this 9.3[9], 90.6[1] split is the only justification I could come up
> with to bring Rayburn into the transaction would be that it would waive the
> headroom value that was accruing under the [Requirements Power Supply
> Agreement].  And under the RPSA, Rayburn was 90.6[1] percent of the load being
> served by the RPSA.

(Docket Entry No. 15-6, at 160).

Sam Rayburn disagrees with Vinton Power's, and Gillis's, representation of the purpose of

the Cambridge Project's payment structure.  Sam Rayburn argues that Vinton Power's "argument

based on 'headroom' makes no sense."  (Docket Entry No. 21-5, at 6).  It also questions the

reliability of Ralph Gillis's testimony, because Gillis gave that testimony as a defendant in a

lawsuit in which the jury ultimately found his testimony unpersuasive and held him liable for fraud.

Sam Rayburn argues that it waived its accumulated "headroom" rights "in conjunction with buying

increased amounts of power from [Entergy Wholesale Operations Marketing] at attractive prices. So, the deal was struck that [Sam Rayburn] (a) would buy additional power from [Entergy Wholesale] at the attractive price at which [Entergy Wholesale] would sell, and (b) [Sam Rayburn] would forego its then accumulated 'headroom' rights and reduce the accrual rate of its right to buy from 3% to 2% for a number of future years."  (*Id.*, at 7).  Put simply, Sam Rayburn waived its accumulated "headroom" rights because Entergy Wholesale Operations Marketing agreed to sell it more power at a lower price, so that Sam Rayburn could, in turn, generate more profit when it resold that power to other entities.  Sam Rayburn also asserts that, of the 90.61% of "remaining funds" that it receives from the Trust, none of that money is generated from Vinton Power's retail sale of power to the Industrial Participants.  Sam Rayburn argues that because Vinton Power receives more money under the Cambridge Project than it did under the Nisco Deal, it is "arithmetically impossible" that Sam Rayburn receives any of Vinton Power's revenues from its retail sales to the Industrial Participants.  (*See* Docket Entry No. 21, at 8–9).

Even though Vinton Power alleges that Sam Rayburn was not supposed to receive 90.61% of the remaining funds after it was fully reimbursed for its "headroom" rights, Sam Rayburn is correct that this understanding is not reflected in any of the contracts.  The Concurrent Operations Protocol provides:

### 4.    Distribution of Project Benefits

Project Benefits include the net revenues from the municipal loads of the SRMPA members participating in the Cambridge Project, plus VPPA's municipal load at Vinton together with its retail industrial customer loads (IP's), plus net revenues from the power sales to Entergy Texas, Inc., through December 31, 2035; provided, that Project Benefits shall not include revenues or loads served under Particular Participation Contracts

such as the Liberty/Boomerang arrangements regardless whether eventually served under the Supplemental RPSA.[]

(a)  The distribution of income between VPPA and SRMPA is the aliquot portion of each entity's five-year average peak non-coincident load contribution as referenced and agreed to in the Series 2002 Bond Refunding.  Those portions are:

| | |
|---|---|
| SRMPA | 90.61% |
| VPPA | 9.39% |

(Docket Entry No. 21-7, at 4–5).

The various contracts making up the Cambridge Project provide that the Cambridge Project will continue until December 31, 2035.  (Docket Entry No. 21-12, at 8; Docket Entry No. 21-6, at 3; Docket Entry No. 21-7, at 4; Docket Entry No. 21-9, at 3).  The Trustee of the Jasper/VPPA trust is required to distribute money in the Trust in the amounts negotiated in "[the Trust Beneficiaries'] assignment instruments."  (Docket Entry No. 21-10, at 7).  Under the clear terms of the Cambridge Project, Sam Rayburn is entitled to receive 90.61% of the remaining funds in the Trust, and the Trustee must distribute those funds accordingly, until the Project's end in 2035. There is no mention of "headroom" rights in the contracts.

The Concurrent Operations Protocol states that the "distribution of income" between Vinton Power and Sam Rayburn was based on "the aliquot portion of each entity's five-year average peak non-coincident load contribution as referenced and agreed to in the Series 2002 Bond Refunding."  The parties explained at the motion hearing that under the Requirements Power Supply Agreement, Sam Rayburn had originally purchased power from Entergy Wholesale Operations on behalf of Vinton Power.  In 2002, Sam Rayburn, Vinton Power, and Entergy Wholesale Operations Marketing entered into an agreement in which Entergy Wholesale Operations Marketing would separate out the amount of power that Vinton Power had been buying

26

from Sam Rayburn, and instead Vinton Power would buy it directly from Entergy Wholesale.  Of the total amount of power that Sam Rayburn and Vinton Power collectively purchased from Entergy Wholesale Operations Marketing, Sam Rayburn historically purchased about 90.61% of the power supply, and Vinton Power, 9.39%.

The contracts provide no support for Vinton Power's "headroom" argument.  The parol evidence rule prohibits this court from considering extrinsic evidence that alters a contract's unambiguous terms, such as Gillis's testimony in state court about the parties' subjective intent behind the 90.61/9.39% division.  *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018); *Nelson v. Comm'r of Internal Rev.*, 17 F.4th 556, 562 (5th Cir. 2021).

The issue is whether under the Cambridge Project payment structure, Sam Rayburn "engag[es] in the distribution and retail sale of electrical power."  Vinton Power argues that Sam Rayburn's receipt of proceeds from Vinton Power's sale of electrical power to the Industrial Participants means that Sam Rayburn has engaged in the distribution and retail sale of electrical power.  Sam Rayburn, and this court, disagree.

The court's interpretation of a statute starts and ends with the text of the statutory provision if its language is unambiguous.  *Matthews v. Lenoir*, 439 S.W.3d 489, 492 (Tex. App. 2014) ("The Texas Supreme Court has repeatedly held that when courts construe statutes, they should start with the text because it is the best indicator of the Legislature's intent.  'When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.'" (quoting

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).  The parties argue that two provisions of the Texas Utilities Code are relevant, sections 163.101 and 163.102.

Section 163.101 of the Texas Utilities Code provides that "two or more public entities may create a municipal power agency . . . if the entities: (1) are municipalities; (2) are engaged in the distribution and sale of electric energy to the public; and (3) receive a major portion of their power through or from an interstate electric system."  Tex. Util. Code § 163.101.  In this case, three cities—Livingston, Liberty, and Jasper—formed a municipal power agency under § 163.101, the Sam Rayburn, so that the agency could help them meet their need to "distribut[e] and s[ell] . . . electric energy to the public."  Put another way, "three Texas cities created [the Sam Rayburn Agency] primarily to acquire and sell electrical power to those cities at wholesale so that those cities might sell at retail to their respective citizens at more attractive prices than the cities could otherwise afford to do."  (Docket Entry No. 6, at 5).  Section 163.101 establishes that there is nothing unlawful about a municipal power agency selling power to another entity, so that the other entity can then engage in a retail sale of power to an end user.

Section 163.102 of the Texas Utilities Code provides that "[a]n agency created under this subchapter may: (1) generate and transmit electrical power and energy inside and outside this state; (2) sell, purchase, or exchange electrical power and energy inside and outside this state; and (3) construct or acquire new steam electric generating facilities, but only if the facilities are owned jointly by the agency and one or more private entities."  Tex. Util. Code § 163.102.  Section

163.102(b) states: "This section does not authorize an agency created under this subchapter to engage in the distribution and retail sale of electric power and energy."

Sam Rayburn argues that it does not "engage in the distribution and retail sale of electric power and energy" because it solely engages in the wholesale "transmi[ssion] of electrical power, as it is authorized to do under § 163.102 of the Texas Utilities Code." Tex. Util. Code § 163.102(1) ("An agency created under this subchapter may . . . generate and transmit electrical power and energy inside and outside this state."). The transmission or sale of electrical energy at wholesale means that the electrical energy is transmitted or sold to another entity for resale. (Docket Entry No. 88, at 2 (citing 16 U.S.C. § 824(d)). This is what Sam Rayburn does under the Cambridge Project. Sam Rayburn contracts only for the wholesale supply of electrical energy for other entities—the Texas cities, Vinton Power, and Entergy Texas, Inc.—which in turn distribute and resell that energy to consumers for use, either the members of the public (for the Texas cities) or Industrial Participants (for Vinton Power).

Vinton Power does not dispute this. Instead, it argues that Sam Rayburn "has been receiving the lion's share of the net profits ('remaining funds') from the distribution and retail sale of electrical power *by Vinton Public Power Authority* . . . to certain industrial customers in Louisiana." (Docket Entry No. 15, at 1 (emphasis added); *see also* Docket Entry No. 42, at 14 (seeking a declaratory judgment that "SRMPA's *receipt* of 'remaining funds' from the Cambridge Project in excess of its contributed headroom constitutes 'engag[ing] in the distribution and retail sale of electric power and energy." (emphasis added))). Section 163.102(b), however, does not prohibit Sam Rayburn from receiving a portion of profits from another entity's "distribution and

29

retail sale" of electrical power.  As Vinton Power clearly states in its own complaint and briefings, Vinton Power is the entity that distributes and sells power to retail consumers, not Sam Rayburn.

Sam Rayburn asserts that "[i]t is typical, of course, in the stream of commerce that retailers use proceeds from their retail sales to cover the wholesale cost to themselves of what they sell to those retail buyers." (Docket Entry No. 21, at 8).  In this case, however, "VPPA does not, itself, directly pay the price of its wholesale purchases of power."  Instead, the parties have agreed to profit from and receive reimbursement for Cambridge Project expenses by receiving an "agreed percentage share of the 'remaining funds' that result from all the inter-related transactions that are covered by the Cambridge Project contracts." (*Id.*).  Sam Rayburn is able to supply Vinton Power with electrical power that it has received from Entergy Wholesale Operations Marketing at a favorable rate.  There is evidence that Sam Rayburn was able to negotiate this favorable rate because of the leverage it had in bargaining away its "headroom" rights.  Vinton Power has provided no persuasive reason or authority for why this payment structure, even after Sam Rayburn has allegedly been reimbursed for its "headroom" rights, should transform Sam Rayburn into a distributor or retail seller of electrical power.  Indeed, if Vinton Power were correct, then Sam Rayburn would receive *no* compensation under the Cambridge Project from now until 2035, despite its continuing contractual obligation to purchase power for the cities of Liberty, Livingston, and Jasper, Entergy Power, Inc., and Vinton Power.  As Sam Rayburn argues, this arrangement would make no sense.  It would leave Sam Rayburn with only expenses and no reimbursement for those expenses.

It is worth further mention that were Vinton Power correct—that Sam Rayburn was unlawfully engaging in the distribution and retail sale of power—the remedy in this case would be

to void the relevant contracts, not to order that "all future 'remaining funds' originating in retail sales pursuant to the Cambridge Project be distributed solely to [Vinton Power]." *See Rogers v. Wolfson*, 763 S.W.2d 922, 924 (Tex. App. 1989) ("Texas courts will not enforce a contract which is void because it violates a statute and is, therefore, illegal."); *McCreary v. Bay Area Bank & Tr.*, 68 S.W.3d 727, 733 (Tex. App. 2001) ("Where a contract is made in violation of a statute, it is illegal and void."). Vinton Power argues that this court could "sever" the offending provision of the contracts—the portion allocating 90.61% of the "remaining funds" to Sam Rayburn. But a contract provision is severable only if the "parties [still] would have entered into the agreement absent the unenforceable provisions." *In re Poly-America, L.P.*, 262 S.W.3d 337, 360 (Tex. 2008). Sam Rayburn would not have entered into the Cambridge Project absent an agreement to be paid for the contractual obligations that it was undertaking.

Because Sam Rayburn has not engaged in conduct, based on Vinton Power's allegations, that exceeds the Texas Utilities Codes' statutory authorization, Vinton Power's claims for declaratory relief and for disgorgement under a theory of "money had and received" are dismissed with prejudice, and Vinton Power's motion for summary judgment, (Docket Entry No. 44), is denied.

The court also grants summary judgment on Sam Rayburn's counterclaim seeking a declaratory judgment. The court issues a declaratory judgment that Sam Rayburn is entitled to continue receiving its 90.61% share of the "remaining funds" under the Cambridge Project, in

accordance with the unambiguous terms of the parties' contractual agreements, until the Project's end date in 2035.  (Docket Entry No. 49, at 2).

## IV.    Remaining Issues

The remaining issues to address are: (1) the crossmotions for summary judgment between Vinton Power and the intervenors; (2) Sam Rayburn's remaining counterclaims against Vinton Power; and (3) the claims by Vinton Power and Sam Rayburn against the Jasper/VPPA Trust and its Trustee.

### A.    The Intervenors

Vinton Power, in its amended complaint, stated that "[i]f the three member cities of [Sam Rayburn] choose to intervene in this lawsuit, [Vinton Power] would seek such legal and equitable relief from them as the court deems appropriate considering all of the evidence in this case, including, at minimum, repayment of the Cambridge Project monies distributed to them during the pendency of this litigation." (Docket Entry No. 42, at 14).  When the cities of Jasper, Liberty, and Livingston moved to intervene, they stated in their motion that "[Sam Rayburn] has distributed millions of dollars to each of the three Cities from [Sam Rayburn's] share of the Cambridge Project Benefits, including a distribution in August of 2021 of $6,000,000 to each City."  (Docket Entry No. 53, at 2).   Vinton Power now seeks recovery of the $18 million that the cities received in August 2021 from Sam Rayburn, because it alleges that Sam Rayburn received that money unlawfully.  (Docket Entry No. 58, at 4).  The intervenors, the cities of Jasper, Liberty, and Livingston, have moved for summary judgment on Vinton Power's claims against them, (Docket

Entry No. 57), and Vinton Public Power Authority has moved for summary judgment against the intervenors, (Docket Entry No. 58).

Because Sam Rayburn did not receive money under the Cambridge Project in violation of the Texas Utilities Code, Vinton Power's claims against the cities fail as well.  Vinton Power's motion for summary judgment is denied, (Docket Entry No. 58), and the cities' motion is granted, (Docket Entry No. 57).  Vinton Power's claims against the intervenor cities are dismissed with prejudice.

### B.    Sam Rayburn's Counterclaims

In its amended answer to Vinton Power's amended complaint, Sam Rayburn raised three counterclaims.  In addition to requesting declaratory relief, which this court has granted, Sam Rayburn alleged that Vinton Power "committed fraud against [Sam Rayburn] when it entered into . . . the Cambridge Project . . . by concealing its intention not to perform its commitments to share the 'remaining funds' . . . on the basis of 90.61% to SRMPA and 9.39% to VPPA" and that it "committed fraud against [Sam Rayburn] by affirmatively representing repeatedly in the Cambridge Project contracts that the sales of electrical power that SRMPA was to make under them were wholesale sales and that they were legal, binding, and enforceable, even though VPPA now reveals that it then harbored the view that those sales were retail sales that were illegal for SRMPA to make."  (*Id.*, at 13).  Sam Rayburn also asks for an injunction to enjoin Vinton Power from "filing . . . unfounded and vexatious" lawsuits in the future.  (*Id.*, at 46).

Vinton Power renewed its motion for summary judgment before Sam Rayburn filed its amended answer, which included new counterclaims, and Vinton Power has not sought to dismiss

Sam Rayburn's counterclaims.  Sam Rayburn has, however, moved for summary judgment on its claims for injunctive relief and declaratory relief.  (Docket Entry No. 49).

The court has granted Sam Rayburn's request for declaratory relief.  The request for further injunctive relief is denied.  Having granted declaratory relief, the court need not also issue an injunction.  *Cf. Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1219 (5th Cir. 1991) (denying injunctive relief when declaratory relief was adequate).  While Vinton Power's claims in this lawsuit were not meritorious, there is no evidence that they were brought with an intent to be abusive or harassing, and there is no evidence that Vinton Power will bring further lawsuits in light of this court's denial of its claims and the declaratory judgment that Sam Rayburn is entitled to receive 90.61% of the remaining funds, as set forth in the Concurrent Operations Protocol.

Sam Rayburn's fraud claim remains, if it wishes to continue to pursue it.  The court takes no position on the merits of that claim, or whether it was pleaded with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b).

### C.    The Trust

Vinton Power added the Jasper/VPPA Settlement Trust and Kim Despeaux as Trustee as defendants in this lawsuit after the court held that they were required parties.  (Docket Entry No. 42).  Vinton Power did not, however, add any claims against the Trust or the Trustee.  As the Trust and Trustee responded in their answer to the amended complaint, Vinton Power's complaint "fails to state an affirmative cause of action against them upon which relief can be granted."  (Docket Entry No. 43, at 1).  Nor is there any claim that Vinton Power can now assert against the Trust and

Trustee after its claims against Sam Rayburn have been dismissed.  Any claims against the Trust and Trustee by Vinton Power—if there are any—are dismissed with prejudice.

Sam Rayburn has also filed a crossclaim against the Jasper/VPPA Settlement Trust and Kim Despeaux, Trustee, "seek[ing] a judgment against the Trust and Trustee finding and declaring that SRMPA is entitled to receive 90.61% of 'remaining funds' . . . and ordering the Trust and Trustee specifically to perform its obligation to distribute that portion of 'remaining funds' to SRMPA."  (Docket Entry No. 50).  Because the court has already declared that Sam Rayburn is entitled to receive 90.61% of the remaining funds, implicit in that declaration is that the Trustee will pay Sam Rayburn the remaining funds in accordance with the parties' contractual agreements. Sam Rayburn's crossclaim against the Jasper/VPPA Settlement Trust and Kim Despeaux, Trustee is also denied.

## V.    Conclusion

Vinton Power's claims against all defendants are dismissed with prejudice.    Vinton Power's motions for summary judgment, (Docket Entries Nos. 44, 58), are denied with prejudice. Sam Rayburn's motion for summary judgment, (Docket Entry No. 49), is granted in part and denied in part.  The intervenors' motion for summary judgment, (Docket Entry No. 57), is granted. Sam Rayburn's crossclaim against the Trust and Trustee is dismissed. Sam Rayburn's counterclaim of fraud against Vinton Power remains, if it wishes to proceed on it.  A scheduling order to resolve that claim will be entered separately.

SIGNED on January 20, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

35